UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| 320 FALL RIVER, LLC, and H. CHARLES TAPALIAN, <br><br> Plaintiffs, <br><br> v. <br><br> TOWN OF SEEKONK, *By and Through Its Board of Selectmen*, MICHELLE A. HINES, *In her capacity as Chairperson of the Board of Selectmen*, DAVID ANDRADE, et al., <br><br> Defendants. | * <br> * <br> * <br> * <br> * <br> * <br> * <br> Civil Action No. 1:25-cv-10171-IT <br> * <br> * <br> * <br> * <br> * <br> * <br> * |

MEMORANDUM & ORDER

April 23, 2025

TALWANI, D.J.

Pending before the court is Plaintiffs H. Charles Tapalian and 320 Fall River, LLC's ("320 Fall River") Motion for Preliminary Injunction [Doc. No. 11].[1] Plaintiffs have moved to enjoin the Town of Seekonk ("the Town") from purchasing recreational real property that Plaintiffs own and seek to develop for residential use. See Mot. [Doc. No. 11]. Plaintiffs assert that the Town's purchase pursuant to a statutory right of first refusal violates Plaintiffs' federal and State constitutional rights and Massachusetts statute. See Compl. ¶¶ 43–71 [Doc. No. 1]. For the reasons set forth below, Plaintiffs' Motion [Doc. No. 11] is DENIED.

---

[1] Plaintiffs filed the document as an Emergency Motion. The court denied emergency relief where Plaintiffs did not file an affidavit or verified complaint showing why emergency relief was required. Elec. Order [Doc. No. 12]; see also Elec. Order [Doc. No. 10] (denying Plaintiffs' prior Emergency Motion [Doc. No. 9] and directing Plaintiffs that "[a]ny renewed motion that seeks relief on an emergency basis must be supported by affidavit or verified complaint showing why relief is required without allowing Defendants 14 days to respond").

I.  Background

   A. *M.G.L. c. 61B*

M.G.L. c. 61B "permits an owner of five or more acres of 'recreational land' to apply for, and receive, a tax assessment based solely on its recreational use." Hingham Land, LLC v. Town of Rockland, 2005 WL 3498342, at *2 (Mass. Land Ct. Dec. 21, 2005) (citing M.G.L. c. 61B, §§ 2 (tax rate), 3 (eligibility process)). Recreational use under this statute includes golfing. M.G.L. c. 61B, § 1.

Recreational land is taxed at a lower tax rate applicable to "open space" in cities and towns that accept the open space designation. See id. § 2A, 3, 6. If a city or town approves an owner's application to designate property as recreational land, that property "shall not be sold for, or converted to, residential, industrial or commercial use" while taxed as recreational land "or within 1 year after that time unless the city or town in which the land is located has been notified of the intent to sell for, or to convert to, that other use." Id. § 9.

If a landowner seeks to sell recreational land or convert it to another use, the landowner must provide notice to the city or town in which the land is located. See id. "In the case of intended or determined conversion not involving sale, the municipality shall have an option to purchase the land at full and fair market value to be determined by an impartial appraisal performed by a certified appraiser." Id.[2] Once the parties determine consideration, the city or town may exercise its option to buy the land "only after a public hearing" and after written notice signed by the mayor or board of selectmen is sent to the landowner. Id.

---

[2] The statute provides for a second appraisal at the landowner's request and, if no agreement can be reached following the second appraisal, for a mutually acceptable appraiser for a third appraisal, which, if sought, "shall be the final determination of consideration." Id.

2

B.  *The Events at Issue Here*

Plaintiffs allege that Tapalian is the sole owner of 320 Fall River. Compl. ¶ 2. [Doc. No 1]. Defendant Michelle A. Hines is the chairperson of the Town's Board of Selectmen ("the Board"). Id. at ¶ 4; Answer ¶ 4 [Doc. No. 15]. Defendant David Andrade is a former Board member. See Compl. ¶ 5 [Doc. No. 1]; Answer ¶ 5 [Doc. No. 15].

320 Fall River owns real property in Seekonk at 320 Fall River Avenue, 763 Arcade Avenue, and 769 Arcade Avenue ("the Property"). Compl. ¶ 9 [Doc. No. 1]; Answer ¶ 9 [Doc. No. 15]. The Property has been classified as "recreational land" under M.G.L. c. 61B, §§ 1, *et seq.*, with Plaintiffs' last application for that classification submitted in September 2021. Compl. ¶ 10 [Doc. No. 1]; Answer ¶ 10 [Doc. No. 15]. Defendants contend that application was granted and effective for fiscal year 2023. Answer ¶ 10 [Doc. No. 15].

Plaintiffs allege that before Defendant Andrade was sworn in as a Board member, he "solicited Mr. Tapalian to engage [Andrade's] company on a project that Mr. Tapalian was in the final stages of completing," and that Tapalian declined his proposal.[3] Compl. ¶¶ 22–23 [Doc. No. 1]. Plaintiffs further allege that Andrade subsequently took retaliatory actions while serving as Chairman of the Board to "block[] Mr. Tapalian's various development proposals." Id. at ¶¶ 23–24.[4]

---

[3] Defendants admit that "in or around 2014 or 2015, Mr. Andrade was an employee of an architectural firm and approached Mr. Tapalian about meeting with the owner of the architectural firm to discuss the firm working on a project." Answer ¶ 22 [Doc. No. 15]. Defendants admit further that around the same time, "the owner of the architectural firm that employed Mr. Andrade gave a presentation and that subsequently the firm issued a quote to Mr. Tapalian to perform the work which proposal was not accepted." Id. ¶ 23. Plaintiffs offer no evidentiary support for their further allegations about this 2014 or 2015 interaction.

[4] Plaintiffs offer no evidentiary support for this allegation.

3

In the Fall of 2022, the Town administrator and Andrade had meetings with Tapalian about the purchase of the Property and a second property, the Showcase Cinema property. Compl. ¶ 21 [Doc. No. 1]; Answer ¶ 21 [Doc. No. 15].[5] What happened during these meetings is in dispute.[6] At some undisclosed time, Tapalian proposed converting the Showcase Cinema property into a cannabis growth facility. Compl. ¶ 24 [Doc. No. 1]; Answer ¶ 24 [Doc. No. 15]. Again, what happened in connection with this proposal is in dispute.[7]

Plaintiffs sought different avenues to repurpose the Property at issue here, including pursuing residential development. Compl. ¶ 11 [Doc. No. 1]; Answer ¶ 11 [Doc. No. 15]. On April 26, 2023, 320 Fall River submitted a project application to MassHousing to develop townhouse units, some of which would be affordable housing. Compl. ¶ 15 [Doc. No. 1]; Answer ¶ 15 [Doc. No. 15]. MassHousing issued a site approval letter on May 23, 2023. Compl. ¶ 16 [Doc. No. 1]; Answer ¶ 16 [Doc. No. 15].

The parties agree that pursuant to M.G.L. c. 61B, § 9, the Town had a right of first refusal to purchase the Property when 320 Fall River sought to convert it from recreational land for any

---

[5] Plaintiffs say Andrade left the Board in 2022, Compl. ¶ 5 [Doc. No. 1], while Defendants say he served until April 2023, Answer ¶ 5 [Doc No. 15]. The court assumes that Mr. Andrade was still a member of the Board at the time of these discussions.

[6] The Town contends that Plaintiffs' proposed purchase price kept increasing over the course of several meetings and the decision was made not to engage in further discussions to purchase the properties. Answer ¶ 21 [Doc. No. 15]. Plaintiffs allege that Tapalian objected to the Town's proposal as fraudulent conduct. Compl. ¶ 21 [Doc. No. 1]. Plaintiffs include no factual allegations to state a claim for fraudulent conduct, let alone any evidentiary support.

[7] Plaintiffs assert a "targeted campaign" against the proposal and a strategy to "infringe upon Plaintiffs' property rights," Compl. ¶¶ 24–25 [Doc. No. 1], but again, include no factual allegations of wrongdoing, let alone any evidentiary support for this claim.

other use, including but not limited to the development of residential housing under M.G.L. c. 40B. Compl. ¶ 17 [Doc. No. 1]; Answer ¶ 17 [Doc. No. 15].

On February 6, 2024, Plaintiffs sent a Notice to the Town of their intent to convert the Property from recreational land and for residential use. Opp'n Ex. 1 CM/ECF p. 8–9 [Doc. No. 16-1]. On July 24, 2024, the parties entered an Agreement Concerning the Administration of a Chapter 61B Option to Purchase for the "Firefly Properties," which provided for an appraiser to value the Property. See id. at CM/ECF p. 12–17.[8] The Agreement included a waiver provision, pursuant to which 320 Fall River agreed to "forever waive[] and relinquish[] its objections to the Town's actions, as well as any and all claims that the Town has waived its right of first refusal/option to purchase the [Property] as of the date of this Agreement," and the Town agreed to "waive[] and relinquish[] its objections to [Plaintiffs'] Notice, as well as any and all claims that the Notice is improper or untimely in any way." Id. at CM/ECF p. 14.

The parties agreed on an appraiser, see id. at CM/ECF p. 13, and on August 29, 2024, the Town commissioned the fair market appraisal of the Property, which provided an opinion on the market value of the Property for acquisition in accordance with M.G.L. c. 61B, § 9. Compl. ¶ 18 [Doc. No. 1]; Answer ¶ 18 [Doc. No. 15]. The appraiser valued the property at $6,970,000. Opp'n Ex. 2 CM/ECF p. 7 [Doc. No. 16-2]. On October 16, 2024, the Town's Select Board held a public hearing on Plaintiff's Notice of Intent to Convert and voted to exercise the Town's statutory right of first refusal to purchase the Property. Counterclaim ¶ 9 [Doc. No. 15]; Answer to Counterclaim ¶ 9 [Doc. No. 24]. On October 24, 2024, the Town notified Plaintiffs that it

---

[8] By this point, Andrade was no longer a member of the Board. See Compl. ¶ 5 [Doc. No. 1] (claiming Andrade left the Board in 2022); Answer ¶ 5 [Doc. No. 15] (asserting Andrade served on the Board until April 2023).

intended to exercise its right of first refusal and purchase the Property for the appraised value. Opp'n Ex. 1 CM/ECF page 2–6 [Doc. No. 16-1].

Plaintiffs and the Town executed a purchase and sale agreement for the Property on November 4, 2024. See Opp'n Ex. 3 [Doc. No. 16-3].[9] On November 18, the Town held a Town Meeting that included a vote on a motion to appropriate funds to purchase the Property pursuant to M.G.L. 61B § 9. Opp'n Ex. 4 [Doc. No. 16-4]. At the Town Meeting, Andrade and Hines spoke in favor of appropriating funds to purchase the property and against allowing its development for residential use.[10] Compl. ¶¶ 32, 35–36 [Doc. No. 1]; Answer ¶¶ 32, 35–36 [Doc. No. 15]; see Opp'n Ex. 4 [Doc. No. 16-4]. The motion passed with 271 votes in favor and 18 against. Id.

The purchase and sale agreement provided that a closing would take place 120 days after the agreement was executed. See Opp'n Ex. 3 [Doc. No. 16-3]. Accordingly, a closing was scheduled for March 4, 2025. See Counterclaim Ex. 2 [Doc. No. 15-2]. Defendants allege that the Town was ready, willing, and able to complete the closing on that date, but that Plaintiffs

---

[9] Plaintiffs allege that the Town entering into the Purchase and Sale Agreement was "part of a clear pattern of conduct showing that the Town and Board consistently violated the Plaintiffs' constitutional rights, revealing a deliberate agenda to undermine Plaintiffs' property rights through intentional and unlawful actions," Compl. ¶ 19 [Doc. No. 1], and that "[t]he Town's retaliatory actions are the result of years of ill will and malicious targeting aimed at Mr. Tapalian due to his refusal to submit to the Town's fraud and masked agenda," id. at ¶ 20. Plaintiffs offer neither evidentiary support for an injunction based on this claim nor specific factual allegations to support these assertions.

[10] Plaintiffs allege that Hines stated, "now this is a chance, and the only chance we're going to get to buy this Property . . . no we don't have significant plans right now for the Property . . . but think of the future . . . or of what's coming up if we don't buy this land." Compl. ¶ 35 [Doc. No. 1] (alterations in original). Plaintiffs allege that Andrade "provided comment that G.L. c. 40B programs can be done well," but also stated that "we have two instances in Town where its [sic] crammed 15 pounds of you know what in a five pound bag." Id. at ¶ 36.

failed to sign over the deed to the Property. Counterclaim ¶ 15–16 [Doc. No. 15]; see also Counterclaim Ex. 2 [Doc. No. 15-2].

## II.   Procedural Background

Plaintiffs filed this action on January 24, 2025, alleging that the Town's exercise of its right of first refusal constitutes an unconstitutional taking (Count I), that the Town's conduct constitutes selective enforcement activity that violates Plaintiffs' First and Fourteenth Amendment rights (Count II), and that the Town's conduct constitutes retaliation for the Plaintiffs' exercise of their First Amendment right to petition the government (Count III). Compl. ¶¶ 43–61 [Doc. No. 1]. Plaintiffs also sought a declaratory judgment that the Purchase Agreement is void and that the Town's actions have deprived Plaintiffs of constitutional rights (Count IV), and sought recission of the Purchase Agreement on the ground that the Town violated M.G.L. c. 30B § 17 (Count V). Compl. ¶¶ 62–71 [Doc. No. 1].

The pending Motion [Doc. No. 11] seeks an order enjoining Defendants (1) from possessing, owning, or maintaining the Property and (2) from selling, conveying, transferring, gifting, or developing the Property in any way. Plaintiffs also seek an order rescinding, voiding, and/or blocking the purchase and sale agreement. Id.[11]

Defendants filed an Answer and Counterclaims [Doc. No. 15] and an Opposition [Doc. No. 16] to the request for a preliminary injunction. Plaintiffs have filed a Reply Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction [Doc. No. 22] and an Answer [Doc. No. 24] to Defendants' Counterclaims.

---

[11] At a hearing on the Motion [Doc. No. 11], Plaintiffs specified that they seek an order staying the Purchase and Sale Agreement for the Property while the parties litigate Plaintiffs' underlying claims.

### III.   Standard of Review

The issuance of a preliminary injunction before a trial on the merits can be held is an "extraordinary remedy" that shall enter only if a plaintiff makes a clear showing of entitlement to such relief. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). In evaluating a motion for a preliminary injunction, the court considers four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

Esso Standard Oil Co. v. Monroig-Zayas, 445 F.3d 13, 17–18 (1st Cir. 2006) (quoting Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8, 11 (1st Cir. 2004)). The moving party bears the burden of establishing that these four factors weigh in its favor. Id. at 18.

The first factor is the most important: If the moving party cannot demonstrate a likelihood of success on the merits, "the remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." Sindicato Puertorriqueño de Trabajadores v. Fortuño, 699 F.3d 1, 10 (1st Cir. 2012) (quoting Respect Maine PAC v. McKee, 622 F.3d 13, 15 (1st Cir. 2010)).

### IV.   Discussion

#### A. *Likelihood of Success on the Merits*

Defendants argue that Plaintiffs cannot succeed on the claims asserted here because those claims were waived by the Agreement Concerning the Administration of a Chapter 61B Option to Purchase for the "Firefly Properties." Opp'n 6–7 [Doc. No. 16]. As explained below, Defendants are likely to prevail on their waiver defense. The court finds in the alternative that,

8

even without the waiver, Plaintiffs have not established that they are likely to succeed on the merits of any claim.

1. Waiver of Objections

"[W]hen the language of a contract is clear, it alone determines the contract's meaning, but . . . a court may consider extrinsic evidence if the language is ambiguous." Balles v. Babcock Power Inc., 476 Mass. 565, 571, 70 N.E.3d 905 (2017). "Contractual language is ambiguous when it 'can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken.'" Id. (quoting Bank v. Thermo Elemental Inc., 451 Mass. 638, 648, 888 N.E.2d 897 (2008)). "When contract language is unambiguous, it must be construed according to its plain meaning." Id.

Parties may contract to waive federal constitutional claims. See D. H. Overmyer Co., Inc., of Ohio v. Frick Co., 405 U.S. 174, 185 (1972) (holding right to notice and hearing prior to civil judgment is subject to waiver); see also Higgins v. Town of Concord, 322 F. Supp. 3d 218, 225 (D. Mass. 2018) (employee's waiver of right to pursue constitutional claims valid if knowing and voluntary). However, courts do not "presume acquiescence in the loss of fundamental rights." D. H. Overmyer, 405 U.S. at 186 (quoting Ohio Bell Tel. Co. v. Pub. Utils. Comm'n, 301 U.S. 292, 307 (1937)). In the First Circuit, a waiver of rights in the civil context must be knowing and voluntary to be effective. See, e.g. Am. Airlines, Inc. v. Cardoza-Rodriguez, 133 F.3d 111, 117 (1st Cir. 1998); Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 181 (1st Cir. 1995).

In determining whether a waiver was knowing and voluntary, courts take a totality-of-the-circumstances approach, examining six non-exhaustive factors: (1) the plaintiff's education, experience, and sophistication; (2) the parties' respective roles in determining the provisions of

the waiver; (3) the agreement's clarity; (4) the time the plaintiff had to study the agreement; (5) whether the plaintiff had independent advice, including from counsel; and (6) the consideration for the waiver. Id. at 181 & n.3. However, "[i]t is not necessary that each be satisfied before a release can be enforced." Melanson v. Browning-Ferris Indus., Inc., 281 F.3d 272, 276 (1st Cir. 2002).

Here, on July 24, 2024, Tapalian, as Manager of 320 Fall River, signed an agreement entitled Agreement Concerning the Administration of a Chapter 61B Option to Purchase for the 'Firefly Properties.' Opp'n Ex. 1 CM/ECF p. 17 [Doc. No. 16-1]. Under the heading "ESSENTIAL TERMS," this agreement provides, *inter alia*:

> (vii) In consideration of this Agreement, the Town hereby forever waives and relinquishes its objections to the Notice, as well as any and all claims that the Notice is improper or untimely in anyway [sic]; and
>
> (viii) Likewise, in consideration of this Agreement, [320 Fall River] hereby forever waives and relinquishes its objections to the Town's actions, as well as any and all claims that the Town has waived its right of first refusal/option to purchase the Firefly Properties as of the date of this Agreement.

Id. at CM/ECF p. 14.[12]

Although the court need not finally interpret this language on a motion for a preliminary injunction, Plaintiffs are not likely to prevail on their argument that this language "refer[s] solely to potential contractual remedies under the Purchase and Sale Agreement." Reply 4 [Doc. No. 22]. The waiver is within an "Agreement Concerning the Administration of a Chapter 61B Option to Purchase for the 'Firefly Properties.'" Opp'n Ex. 1 CM/ECF p. 12 [Doc. No. 16-1]. The parties entered this agreement to settle an existing dispute "regarding the Town's option to

---

[12] The agreement explains in the Recitals that the Town had claimed that 320 Fall River's Notice was defective under Chapter 61B and that 320 Fall River had disputed that claim and maintained that the Town had waived its option to purchase the Property. Id. at CM/ECF p. 12.

10

purchase the Firefly Properties under M.G.L. c. 61B" and "to avoid litigation" so that the parties could proceed through the appraisal and sale process. See id. In this context, "the Town's actions" are those that the Town took to purchase the Property under Chapter 61B, and Plaintiffs' waiver is of any challenge to those actions. And the waiver contains no language that limits the nature of the claims that Plaintiffs agreed to waive. To the contrary, the agreement specifies that Plaintiffs waived objections to the Town's actions "as well as" its specific claims that the Town had waived its option. Accordingly, Defendants are likely to prevail on a defense that Plaintiffs have waived their claims that the Town's purchase of the Property constitutes an unlawful taking (Count I), selective enforcement activity (Count II), or First Amendment Retaliation (Count III). Plaintiffs are thus not likely to prevail on those claims.

Plaintiffs suggest that their claims do not fall under the waiver provision because "the Town's unlawful conduct and the essence of [Defendants'] constitutional violations became unmistakably clear during the November 18, 2024, public hearing—nearly four months after the Agreement was signed." Reply 4 [Doc. No. 22]. But Plaintiffs' suggestion that a waiver of claims of past wrongdoing depends on a later-developed understanding of the Town's motive for that conduct would nullify the waiver provision.[13] And, as discussed below, while the waiver does not appear to cover wrongdoing that might occur after the Agreement was signed, Plaintiffs have offered no evidence of such wrongdoing. In sum, Plaintiffs' likelihood of success as to any claims, including constitutional claims, challenging the Chapter 61B process or the Agreement itself are unlikely to succeed in light of the waiver provision.

---

[13] As explained further below, Plaintiffs have in any event failed to offer any evidentiary support for their claims of an unlawful motive.

The waiver was also knowing and voluntary. Plaintiffs' Complaint indicates that Tapalian has pursued other development projects with the Town. See Compl. ¶¶ 23–24 [Doc. No. 1]. Additionally, the agreement states that each signatory "acknowledges, represents, warrants, affirms, and confirms" that "[e]ach Party has read this Agreement, understands the effect and scope of this Agreement and has had the assistance of separate and independent legal counsel of its choice in carefully reviewing, discussing and considering all terms of this Agreement or has elected to enter into this Agreement without consulting legal counsel." Opp'n Ex. 1 CM/ECF p. 15 [Doc. No. 16-1]. These affirmances support Defendants' claim that Plaintiffs voluntarily and knowingly agreed to the waiver provision. See Smart, 70 F.3d at 181 n.3.

Plaintiffs assert that they "could not have received informed advice regarding the waiver of constitutional rights" because "the full extent of the Town's unlawful actions had not yet come to light." Reply 4 [Doc. No. 22]. But "[i]n a business context when sophisticated parties have reduced their understandings to writing, they cannot be heard to allege that they didn't really mean what they said or that they didn't understand what they were doing." Davidson v. Gen. Motors Corp., 57 Mass. App. Ct. 637, 643, 786 N.E.2d 845 (2003). Here, where Tapalian is an experienced developer and affirmed that he understood the effect of the agreement that included the waiver, Plaintiffs' argument that the waiver was not knowing and voluntary because of a later-discovered motive is not likely to succeed.

In sum, Defendants are likely to establish that Plaintiffs agreed to waive the claims that they assert here. Consequently, Plaintiffs cannot establish that they are likely to prevail on those claims.

2. Unconstitutional Taking

In the event that the waiver provision does not bar Plaintiffs' claims, Plaintiffs have not established that they are likely to succeed on the merits of any claim.

Plaintiffs argue that the Town's exercise of its right of first refusal constitutes an unlawful taking because it did not purchase the property for "a legitimate public use." Mem. ISO Mot. for Preliminary Injunction 9 [Doc. No. 5]. The Town argues that its exercise of its statutory right of first refusal to purchase the property does not amount to an unlawful taking because the Town purchased the Property under Chapter 61B rather than taking it by eminent domain, Chapter 61B does not require that the purchase be for a public use, and because Plaintiffs agreed to sell the Property for the appraised value. Opp'n 7–10 [Doc. No. 16].

The Fifth Amendment to the United States Constitution, which applies to States through the Fourteenth Amendment, provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V; see also Mass. Const. Pt. 1, art. X ("[W]henever the public exigencies require that the property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor."). A taking may occur when the government "physically acquires private property for a public use" or when the government "instead imposes regulations" that "go 'too far'" in restricting "an owner's ability to use his own property." Cedar Point Nursery v. Hassid, 594 U.S. 139, 147–49 (2021).

"[A] property owner has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it." Knick v. Twp. of Scott, Pennsylvania, 588 U.S. 180, 189 (2019). The Fifth Amendment thus protects the right to receive just compensation for the government's appropriation of private property, but it does not protect against appropriation itself. See U.S. ex rel. Tenn. Valley Auth. v. Welch, 327 U.S. 546, 554–55

13

(1946) (explaining "[w]here public need requires acquisition of property, that need is not to be denied because of an individual's unwillingness to sell" and "individuals may be required to relinquish ownership of property so long as they are given that just compensation which the Constitution requires." In <u>Lingle v. Chevron U.S.A. Inc.</u>, the Supreme Court explained:

> [T]he Takings Clause "does not prohibit the taking of private property, but instead places a condition on the exercise of that power." In other words, it "is designed not to limit the governmental interference with property rights <u>per se</u>, but rather to secure <u>compensation</u> in the event of otherwise proper interference amounting to a taking."

544 U.S. 528, 536–37 (2005) (quoting <u>First English Evangelical Lutheran Church of Glendale v. County of Los Angeles</u>, 482 U.S. 304, 314–15 (1987) (emphasis in original)) (cleaned up).

At the same time, "[t]he public use requirement of the Takings Clause mandates that 'one person's property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid.'" <u>Fideicomiso De La Tierra Del Cano Martin Pena v. Fortuno</u>, 604 F.3d 7, 17 (1st Cir. 2010) (quoting <u>Thompson v. Consol. Gas Utils. Corp.</u>, 300 U.S. 55, 80 (1937). "Under those circumstances, a 'plaintiff that proves that a government entity has taken its property for a private, not a public, use is entitled to an injunction against the unconstitutional taking, not simply compensation.'" <u>Id.</u> (quoting <u>Carole Media LLC v. New Jersey Transit Corp.</u>, 550 F.3d 302, 308 (3d Cir. 2008)). However, a court's review of whether a taking is "for 'public use' is necessarily deferential: 'When the legislature's purpose is legitimate and its means are not irrational, . . . empirical debates over the wisdom of takings . . . are not to be carried out in the federal courts.'" <u>Id.</u> (quoting <u>Haw. Housing Auth. v. Midkiff</u>, 467 U.S. 229, 242–43 (1984).

Here, Plaintiffs are unlikely to establish that the Town's exercise of its right of first refusal was not for a public purpose. The Town's decision to purchase the property results in the transfer of Plaintiffs' property into public ownership so that it remains recreational land. See

14

Fortuno, 604 F.3d at 18 (explaining takings that transfer private property to public ownership so property is administered for public good and takings that make property available for public use are categories of "quintessentially legitimate public uses under the Takings Clause"). And the Town's exercise of its right of first refusal reflects a judgment that the Town's land use planning goals are better served by maintaining the Property as recreational land rather than allowing residential development. Further, the Town decided to appropriate funds for the purchase following an appraisal and pursuant to a Town Meeting vote. Plaintiffs are unlikely to establish that this constitutes "irrational" means. See Fortuno, 604 F.3d at 18.

      At the hearing on Plaintiffs' Motion [Doc. No. 11], Plaintiffs argued that the purchase of the Property was unlawful because the Town exercised its right for the purpose of blocking Plaintiffs' proposed development, citing Pheasant Ridge Associates Limited Partnership v. Town of Burlington, 399 Mass. 771, 506 N.E.2d 1152 (1987). In Pheasant Ridge, the Supreme Judicial Court held that a town's taking of property was unlawful because the town exercised its eminent domain power in bad faith and "was concerned only with blocking" the plaintiffs' proposed low- and moderate-income housing development. Id. at 773, 779. But here, the Town did not take the Property. Instead, it exercised a statutory right to purchase the Property, which arose because Plaintiffs gave notice of their intent to pursue a residential development project. See M.G.L. c. 61B § 9. Under Chapter 61B, the Town received that right in exchange for granting Plaintiffs preferential tax treatment. This scheme, which incentivizes landowners to maintain property as recreational land and allows municipalities to purchase such property before the landowner converts it to another use, indicates that the purpose of Chapter 61B is to allow municipalities to maintain land that can be used for the recreational activities set forth in Chapter 61B § 1.

Therefore, even assuming the Town exercised its option to prevent residential development, its decision is consistent with the purpose of Chapter 61B.

Further, Plaintiffs are unlikely to succeed on their takings claim where the Town is purchasing the Property for its appraised value. Plaintiffs agreed to use the appraiser who valued the Property, Opp'n Ex. 1 CM/ECF p. 13 [Doc. No. 16-1], agreed to sell the Property to the Town at the appraised value, Opp'n Ex. 3 CM/ECF p. 3 [Doc. No. 16-3]; see Opp'n Ex. 2 CM/ECF p. 7 [Doc. No. 16-2] (appraisal), and do not now claim that the purchase price they agreed to does not amount to "just compensation."

In sum, Plaintiffs have made no showing that they are likely to succeed in establishing that the Town violated the public purpose or just compensation requirements of the takings clause.

### 3. First Amendment Retaliation

Plaintiffs assert that 320 Fall River's application to the Town to develop the Property under M.G.L. c. 40B is protected by their First Amendment right to "petition the Government for a redress of grievances." Mem. ISO Mot. for Preliminary Injunction 10–11 [Doc. No. 5]; see Compl. ¶ 56; U.S. Const. Amend. I; cf. Mass. Const. Pt. 1, art. XVI ("The right of free speech shall not be abridged"). Plaintiffs claim that the Town's exercise of its option to purchase the property constitutes retaliation for pursuing this development. Mem. ISO Mot. for Preliminary Injunction 11–13 [Doc. No. 5].

To succeed on a retaliation claim under the First Amendment in the First Circuit, plaintiffs must prove that "(1) [they] engaged in constitutionally protected conduct, (2) [they] were] subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action." D.B. ex rel. Elizabeth B. v. Esposito, 675

F.3d 26, 43 (1st Cir. 2012). An adverse action is one that would likely dissuade a reasonable person from engaging in protected conduct. See id. at 41.

Regardless of whether Plaintiffs' application to the Town to develop the Property is protected conduct,[14] Plaintiffs are not likely to demonstrate that any Defendant's conduct constitutes "adverse action." Plaintiffs assert that Defendants "conspired" to block Plaintiffs' development plans at the Town's November 18, 2024 hearing. Mem. ISO Mot. for Preliminary Injunction 12–13 [Doc. No. 5]. However, the Town's decision to appropriate funds to complete the purchase was made pursuant to a Town Meeting vote, with 271 votes in favor of the appropriation and 18 votes against it. Opp'n Ex. 4 [Doc. No. 16-4]. Plaintiffs offer no support for the proposition that an unfavorable decision on a development proposal made pursuant to apparently lawful procedures satisfies the adverse action requirement.

Plaintiffs also reference Hines's and Andrade's statements at the meeting in opposition to Plaintiffs' project. Mem. ISO Mot. for Preliminary Injunction 13 [Doc. No. 5]. However, where Hines spoke in her capacity as Chairperson for the Town's Board of Selectmen, her statement is government speech, not an adverse action. See Goldstein v. Galvin, 719 F.3d 16, 30 (1st Cir. 2013) ("Courts have not been receptive to retaliation claims arising out of government speech.") And Plaintiffs have no First Amendment retaliation claim against Andrade based on his conduct in 2024, when he spoke as a private citizen. See Hudgens v. N.L.R.B., 424 U.S. 507, 513 (1976)

---

[14] Courts have reached differing conclusions regarding whether seeking approval of development projects constitutes petitioning the government for a redress of grievances under the First Amendment. See Najas Realty, LLC v. Seekonk Water Dist., 68 F. Supp. 3d 246, 254 (D. Mass. 2014), aff'd, 821 F.3d 134 (1st Cir. 2016) (citing Hampton Bays Connections v. Duffy, 127 F. Supp. 2d 364, 373 (E.D.N.Y. 2001) and WMX Techs., Inc. v. Miller, 197 F.3d 367, 372 (9th Cir. 1999)).

17

("It is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee only against abridgment by [the] government . . . .").

Plaintiffs argue that Defendants' previous opposition to Tapalian's other projects combined with its decision to purchase the Property instead of allowing development "demonstrate a clear pattern of retaliation." See Mem. ISO Mot. for Preliminary Injunction 12–13 [Doc. No. 5]. However, where the court has determined that Plaintiff likely cannot demonstrate that Defendants' conduct in exercising the Town's right of first refusal constitutes adverse action in response to Plaintiffs' application to pursue this development, the court need not evaluate whether Defendants' alleged past conduct suggests Defendants acted with a retaliatory motive.

Plaintiffs claim under 42 U.S.C. § 1983 (Count II) and their claim for a declaratory judgment (Count IV) assert that Defendants violated the constitutional rights asserted in Counts I and III. See Compl. ¶¶ 50–54, 62–66 [Doc. No. 1]; Mem. ISO Mot. for Preliminary Injunction 7 [Doc. No. 5]. Where the court has found Plaintiffs are not likely to establish that Defendants violated those rights, Plaintiffs are not likely to succeed on Counts II and IV.

    4.  M.G.L. c. 30B

Defendants argue that Plaintiffs are not likely to succeed on their claim that the Town violated M.G.L. c. 30B §§ 16 and 17 because those provisions do not apply to the Town's purchase of the Property under M.G.L. c. 61B § 9. Opp'n 14–15 [Doc. No. 16]. The Town also points out that M.G.L. c. 30B § 17 is enforced through civil actions brought by the inspector general and does not create a private cause of action. Id. at 15.

M.G.L. c. 30B § 16 is inapplicable to the Town's purchase of property. M.G.L. c. 30B § 16(a) requires a government body to "declare . . . property available for disposition

and . . . specify the restrictions, if any, that it will place on the subsequent use of the property" when it "determines that it shall <u>rent, convey, or otherwise dispose</u> of real property." (Emphasis added). § 17(c) provides that "[a] person who causes or conspires with another to cause a contract to be solicited or awarded in violation of a provision of this chapter shall forfeit and pay to the appropriate governmental body a sum of not more than two thousand dollars for each violation."

Here, the Town is purchasing property from private parties, not awarding a contract for rental, conveyance, or disposal of its property. Further, even assuming § 16 applies to this transaction, Plaintiffs misread M.G.L. c. 30B § 17(c) in asserting that it requires "any party who conspires to cause a contract to be awarded in violation of this chapter" to "forfeit the contract." <u>See</u> Mem. ISO Mot. for Preliminary Injunction 14 [Doc. No. 5]. Instead, those who violate Chapter 30B must "<u>forfeit and pay to the appropriate governmental body</u> a sum of not more than two thousand dollars for each violation." M.G.L. c. 30B § 17(c) (emphasis added).

Additionally, Defendants are correct that § 17(d) provides that "[t]he inspector general shall have authority to institute a civil action" to enforce the penalty provision "if authorized by the attorney general." Where M.G.L. c. 30B does not cover the transaction at issue, provide for the remedy that Plaintiffs seek, or provide a private cause of action, Plaintiffs are unlikely to succeed on the merits of their claim under M.G.L. c. 30B.

In sum, Plaintiffs have not established a likelihood of success on any claim. Consequently, they are not entitled to preliminary injunctive relief, and the court need not reach Plaintiffs' arguments regarding irreparable harm, the balance of hardships, and the public interest. <u>New Comm Wireless Servs.</u>, 287 F.3d 1, 9 (1st Cir. 2002) (explaining that where

plaintiff cannot establish likelihood of success, remaining factors "become matters of idle curiosity").

## V.     Conclusion

For the foregoing reasons, Plaintiffs' <u>Motion for Preliminary Injunction</u> [Doc. No. 11] is DENIED.

IT IS SO ORDERED.

April 23, 2025                                         /s/Indira Talwani
                                                       United States District Judge