UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

320 FALL RIVER, LLC, and     *
H. CHARLES TAPALIAN,       *
                    *
  Plaintiffs,           *
                    *
    v.               *
                    *
TOWN OF SEEKONK, by and through its   *
Board of Selectmen; MICHELLE A. HINES,   *     Civil Action No. 1:25-cv-10171-IT
in her capacity as Chairperson of the     *
Board of Selectmen; DAVID ANDRADE;   *
JOHN DOES 1-10; and XYZ       *
CORPORATIONS 1-10,         *
                    *
  Defendants.           *
                    *

MEMORANDUM & ORDER

April 7, 2026, corrected April 9, 2026

TALWANI, D.J.

Pending before the court is Defendants The Town of Seekonk (the "Town"), Michelle A.

Hines, and David Andrade's Motion for Summary Judgment [Doc. No. 34] on all claims set forth

in Plaintiffs 320 Fall River, LLC ("320 Fall River") and H. Charles Tapalian's Complaint [Doc.

No. 1]. For the reasons set forth herein, Defendants' Motion [Doc. No. 34] is GRANTED.

## I.   Factual Background

A. *The Parties and the Disputed Property*

Plaintiff Tapalian owns Plaintiff 320 Fall River. Until completion of the underlying

transaction in this case on April 30, 2025, 320 Fall River owned real property consisting of a

multiacre parcel of land and two single family lots (the "Property"). Defs.' Statement of Facts

("DSUMF") Ex. 1-B, at ECF 12 ("Chap. 61B Agreement") [Doc. No. 36-1].

Defendant Town of Seekonk, Massachusetts (the "Town"), is the municipality in which the Property is located. Defendant Hines is Chairperson of the Board of Selectmen (the "Board") for the Town. Defendant Andrade is a former member of the Board.[1]

B.   *Prior Classification of the Property*

The Property, which was formerly the site of a golf course, was classified as "recreational land" under Mass. Gen. Laws ch. 61B ("Chapter 61B") "until the end of 2023." Pursuant to that classification, the Property was taxed at a lower rate applicable to designated "open space." See Mass. Gen. Laws ch. 61B, § 2A; Chap. 61B Agreement at ECF 12 [Doc. No. 36-1].

When a property is designated as recreational land by the city or town in which it is located, the property "shall not be sold for, or converted to, residential, industrial or commercial use" while it is taxed as recreational land "or within 1 year after that time unless the city or town in which the land is located has been notified of the intent to sell for, or to convert to, that other use." Mass. Gen. Laws ch. 61B, § 9. The property owner must provide notice to the city or town if the owner intends to sell the land or convert it to "residential, industrial or commercial use." Id.

"In the case of intended or determined conversion not involving sale, the municipality shall have an option to purchase the land at full and fair market value to be determined by an impartial appraisal performed by a certified appraiser" at the city or town's expense. Id. The property owner retains the right to "revoke the intent to convert at any time and with no recourse to either party" during the appraisal process. Id. Should the city or town elect to exercise its

---

[1] In their Complaint [Doc. No. 1], Plaintiffs also list "John Does 1–10" and "XYZ Corporation(s) 1–10" as Defendants. Id. ¶ 6. According to Plaintiffs, these Defendants "are a person or persons whose identit(ies) is/are currently unknown to Plaintiffs yet who, upon information and belief, have aided, assisted, and/or conspired with the other above-named Defendant(s) with respect [to] the Constitutionality and/or legally violative conduct described in this Complaint." Id.

purchase option post-appraisal, it may do so "only after a public hearing followed by written notice signed by the mayor or board of selectmen[.]" Id.

    C. *February 6, 2024 Notice of Intent to Convert and July 24, 2024 Agreement Concerning the Administration of a Chapter 61B Option to Purchase the Property*

In or around the fall of 2022, the Town's Administrator and Andrade met with Tapalian regarding the purchase of the Property and another property owned by Tapalian. Compl. ¶ 22 [Doc. No. 1]; Answer ¶ 22 [Doc. No. 15]. During that meeting, the Administrator and Andrade discussed purchasing the Property using "Community Preservation Committee funds[,]" Compl. ¶ 21 [Doc. No. 1]; Answer ¶ 21 [Doc. No. 15], but the parties ultimately did not reach an agreement at that time.

In January 2023, Plaintiffs submitted a Comprehensive Permit Site Approval Application to MassHousing, setting forth a plan under Mass. Gen. Laws ch. 40B to redevelop the Property with 280 residential units, including seventy affordable housing units. Opp'n Ex. 2, at 4–5 [Doc. No. 43-2]. 320 Fall River notified the Town of the pending application and, on February 9, 2023, participated in a site visit to the Property with Town officials and MassHousing representatives. Compl. ¶¶ 13–14 [Doc. No. 1]; Answer ¶¶ 13–14 [Doc. No. 15]. Plaintiffs thereafter submitted a "full application" to MassHousing, which sent 320 Fall River a site approval letter dated May 23, 2023. Compl. ¶¶ 15–16 [Doc. No. 1]; Answer ¶¶ 15–16 [Doc. No. 15].

In a letter dated February 6, 2024, Plaintiffs' counsel notified the Town that Plaintiffs intended to convert the property from recreational use to residential use. See Opp'n Ex. A, at 1–2 [Doc. No. 43-1] ("Notice of Intent to Convert Recreational Land Pursuant to M.G.L. c. 61B § 9[,]" the "Notice of Intent[,] or the "Notice").

Plaintiffs and the Town subsequently disagreed as to (1) whether Plaintiffs' Notice of Intent [Doc. No. 43-1] was defective under the requirements of Chapter 61B; and (2) whether the

3

Town waived its statutory option to purchase the Property, which it then sought to pursue. See Chap. 61B Agreement at ECF 12 [Doc. No. 36-1]. To "avoid litigation[,]" on July 24, 2024, the parties entered into an agreement regarding the Town's Chapter 61B option (the "Chapter 61B Agreement" or the "Agreement"). Id.

Per the terms of that Agreement, the Town "forever waive[d] and relinquishe[d] its objections to the Notice, as well as any and all claims that the Notice is improper or untimely in any[] way[.]" Id. at 3 ¶ 2(vii). 320 Fall River likewise "forever waive[d] and relinquish[ed] its objections to the Town's actions, as well as any and all claims that the Town has waived its right of first refusal/option to purchase the [Property] as of the date of [the] Agreement." Id. at 3 ¶ 2(viii). The Agreement also included a "Finality" clause, in which the parties averred that the Agreement was "intended to be final and binding among all Parties[,]" and an acknowledgment that the Agreement "contain[ed] the full and complete agreement by and among them[.]" Id. at 3 ¶¶ 6–7.

To facilitate the Town's exercise of the Chapter 61B option, the parties agreed to "jointly engage" an appraiser, Peter M. Scotti & Associates, Inc. ("Scotti"), "to prepare an appraisal reflecting the fair market value of the [Property], which appraised amount shall be in an amount that reflects their highest and best use as required by [Mass. Gen. Laws ch.] 61B § 9." Id. at 2 ¶ 2(i). Each party would pay fifty percent of the cost of the appraisal and consented to be bound by Scotti's finalized appraisal "for the purposes of the Town's option to purchase under Chapter 61B § 9, with neither Party having any right to seek further appraisal(s) under said Chapter." Id. at 2 ¶ 2(i), (v).

Upon completion of the appraisal, the Town would determine whether it would exercise or decline its option to purchase the Property "[w]ithin thirty (30) days[.]" Id. at 2 ¶ 2(vi). If the

4

Town elected to purchase the Property, it agreed to provide a purchase and sales agreement to 320 Fall River "for review and comment" within another thirty-day period and close on the purchase within 120 days from the execution of the purchase and sales agreement, with "typical title and inspection contingencies" and a contingency for "Town Meeting approval, a debt exclusion or a Proposition 2 ½ override." Id. If the Town did not fulfill such contingencies and close on the Property within the 120-day period, "its option to purchase (or right of first refusal) under [Chapter 61B would] be deemed waived, with it having no further recourse and/or rights under said Chapter pertaining to the [Property]." Id.

D. *The Appraisal, Subsequent Public Hearing, and Notice of Intent to Convert*

Scotti provided the Town and Plaintiffs with an appraisal of the Property on September 27, 2024. DSUMF Ex. 2, at 3 ("Appraisal Rep.") [Doc. No. 36-2]. Per that appraisal, the estimated market value of the fee simple interest of the Property was $6,970,000. Id. at 6.

On October 16, 2024, the Town's Board of Selectmen held a public hearing, in which it voted to exercise the Town's right under Chapter 61B to purchase the Property. DSUMF Ex. 1, at ECF 2 [Doc. No. 36-1]. The Town proceeded to record a "Notice of Intent to Exercise Option Pursuant to G.L. c. 61B, § 9 [as to the Property]" in the Bristol County North Registry of Deeds on October 24, 2024. Id. at ECF 4–6.

E. *November 2024: Purchase and Sale Agreement and Town Meeting*

On November 4, 2024, the Town entered into a Purchase and Sale Agreement with 320 Fall River for the Property, at the $6,970,000 appraisal price. Opp'n Ex. E, at 1–2 [Doc. No. 43-5] ("Purchase and Sale Agreement"). The Town would receive a quitclaim deed for the Property. See id. at 2. Both parties were represented by counsel. See id. at 1 (identifying the "Seller's Attorney" and the "Buyer's Attorney").

At the Town's Fall Town Meeting on November 18, 2024, residents voted to appropriate the requisite $6,970,000 to purchase the Property "for general municipal purposes." DSUMF Ex. 4, at ECF 3 [Doc. No. 36-4] ("Certified Town Meeting Vote"). Both Defendant Hines, as Chairperson of the Town's Board of Selectmen, and Defendant Andrade, who was no longer a member of the Board,[2] spoke in favor of the appropriation. See DSUMF ¶¶ 13–14 [Doc. No. 36].

F.    *Closing on the Property*

The parties scheduled the closing on the Property for March 4, 2025, at 11:00 a.m., but Plaintiffs did not appear as scheduled. DSUMF ¶ 15 [Doc. No. 36]; see Pls. Resp. SUMF ¶ 15 [Doc. No. 42] (disagreeing with Defendants' characterization of Plaintiffs' non-appearance but not denying that Plaintiffs did not, in fact, appear for the closing).

The closing on the Property ultimately occurred on April 30, 2025, at which point Defendants accepted and recorded a quitclaim deed for the Property in exchange for the $6,970,000 agreed-upon purchase price. See DSUMF Ex. 6, at ECF 2–5 [Doc. No. 36-6] ("Quitclaim Deed").

## II.    Procedural Background

Plaintiffs commenced this action on January 24, 2025, asserting five claims: (1) violation of 42 U.S.C. § 1983, insofar as Defendants effected an "unlawful taking" of Plaintiffs' property in violation of the Fifth Amendment to the United States Constitution (Count I); (2) "targeted and selective enforcement activity" that deprived Plaintiffs of their civil rights, also in violation of 42 U.S.C. § 1983 (Count II); (3) "First Amendment [r]etaliation[,]" also in violation of

---

[2] The record is unclear as to Andrade's specific date of departure from the Board, but there is no dispute that Andrade was no longer a member of the Board by April 2023. See Compl. ¶ 5 [Doc. No. 1] (alleging that Andrade was a member of the Board from 2016 to 2022); Answer ¶ 5 [Doc. No. 15] (responding that Andrade was a member from April 2014 to April 2023).

42 U.S.C. § 1983 (Count III); (4) entitlement to declaratory or injunctive relief pursuant to

28 U.S.C. § 2201 and Mass. Gen. Laws ch. 231A, § 1 et seq, that the "[Purchase and Sale

Agreement] is void as a matter of law and the Defendants actions violate the United States

Constitution and Constitution of the Commonwealth of Massachusetts." (Count IV); and (5)

"statutory rescission" pursuant to Mass. Gen. Laws ch. 30B, § 17 (Count V). Compl. ¶¶ 43–71

[Doc. No. 1] (cleaned up).

On February 26, 2025, Plaintiffs sought a temporary restraining order ("TRO") and

preliminary injunction, in which they requested that the court enjoin Defendants from

"possessing, owning, [] maintaining[,] . . . selling, conveying, transferring, gifting, or

developing" the Property and enter an order "rescinding, voiding, and/or blocking the

Agreement." Pls.' Emergency Ex Parte Mot. for TRO & Prelim. Inj. 1–2 [Doc. No. 11].

Defendants opposed interlocutory review and, in Defendants' Answer [Doc. No. 15] to

Plaintiffs' Complaint [Doc. No. 1], the Town asserted counterclaims against Plaintiffs for breach

of contract and specific performance. See Answer 12 ¶ 1–13 ¶ 11 [Doc. No. 15]. The court

ultimately declined to grant either a TRO or a preliminary injunction. See generally Mem. &

Order [Doc. No. 26]; Elec. Order [Doc. No. 12].

Defendants subsequently moved for summary judgment on all of Plaintiffs' claims. See

Mot. for Summ. J. 1–3 [Doc. No. 34]. In response, Plaintiffs moved to defer the motion under

Federal Rule of Civil Procedure 56(d) to permit discovery on "disputed factual assertions that

remain entirely undeveloped." See Mot. to Defer Defs.' Mot. for Summ. J. Pursuant to R. 56(d) 1

("Rule 56(d) Motion") [Doc. No. 37]. The court denied the Rule 56(d) Motion [Doc. No. 37]

where Plaintiffs failed to identify "any facts asserted in Defendants' Local Rule 56.1 Statement

of Facts that [were] disputed or that require[d] discovery to contest" and therefore did not show

"how discovery [would] influence the outcome of Defendants' Motion for Summary Judgment [Doc. No. 34][.]" Elec. Order [Doc. No. 40]. Plaintiffs opposed Defendants' motion thereafter. See Opp'n [Doc. No. 43]. In light of the denial of Plaintiffs' Rule 56(d) Motion [Doc. No. 37], on September 30, 2025, the court stayed, inter alia, depositions and the filing of motions to compel until the court rendered a decision on Defendants' fully briefed summary judgment motion. See Elec. Clerk's Notes [Doc. No. 45].[3]

The parties jointly stipulated to dismissal of the Town's counterclaims on October 21, 2025. Joint Stipulation 1 [Doc. No. 60]. On November 4, 2025, Plaintiffs filed an Emergency Motion for Temporary Restraining Order [Doc. No. 61], in which they sought a court order enjoining Defendants, approximately six months after the Town closed on the Property, "from selling, conveying, transferring, encumbering, or otherwise disposing of the [Property] pending further order of the Court." See id. at 1–2. The court ordered Plaintiffs to supplement the motion with an "expla[nation of] the basis in law or equity for the requested emergency relief," see Elec. Order [Doc. No. 63], and denied the Motion [Doc. No. 61] when Plaintiffs failed to respond, see Elec. Order [Doc. No. 64].

---

[3] On October 10, 2025, Plaintiffs nonetheless filed four motions to compel Defendants to provide more documents and more complete answers to interrogatories. See Pls.' Mot. to Compel Def[s.] [The Town of Seekonk and Michelle A. Hines] to Provide More Complete Answers to Their First Req. for Produc. of Docs. [Doc. No. 46]; Pls.' Mot. to Compel Def[s.] [The Town of Seekonk and Michelle A. Hines] to Provide Further and More Complete Answers to Interrogs. [Doc. No. 48]; Pls.' Mot. to Compel Def. David Andrade to Provide More Complete Answers to Interrogs. [Doc. No. 50]; and Pls.' Mot. to Compel Def. David Andrade to Provide More Complete Answers to Their First Req. for Produc. of Docs. [Doc. No. 52]. Where Plaintiffs filed these motions despite the partial stay, see Elec. Clerk's Notes [Doc. No. 45], and without leave of court, the four motions to compel are DENIED.

### III.    Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Baker v. St. Paul Travelers Ins. Co., 670 F.3d 119, 125 (1st Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This burden can be satisfied in two ways: (1) by submitting affirmative evidence that negates an essential element of the non-moving party's claim or (2) by demonstrating that the non-moving party failed to establish an essential element of its claim. Id. at 331.

Once the moving party establishes the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of material fact remains. Id. at 321.  The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of [the] pleadings." Anderson, 477 U.S. at 248. Rather, the non-moving party must "go beyond the pleadings and by [his or] her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324 (quotations omitted). Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. Anderson, 477 U.S. at 248.

Generally, such a motion is brought after the parties have completed discovery. See Celotex Corp, 477 U.S. at 322 ("In our view, the plain language of Rule 56(c) mandates the entry

9

of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Nonetheless, unless a local rule or court order provides otherwise, the movant may file a summary judgment motion before discovery is complete or before it has even commenced. See Fed. R. Civ. P. 56(b) ("[A] party may file a motion for summary judgment at any time until 30 days after the close of all discovery."). However, "the party opposing the motion for summary judgment bears the burden of responding only after the moving party has met its burden of coming forward with proof of the absence of any genuine issues of material fact." Celotex Corp, 477 U.S. at 322.

Moreover, even if the movant meets its burden, to prevent a court from "swinging the summary judgment axe too hastily," Rule 56(d) (formerly Rule 56(f)) provides "a method of "buying time for a party who . . . can demonstrate an authentic need for, and an entitlement to, an additional interval in which to marshal facts essential to mount an opposition." Resol. Tr. Corp. v. N. Bridge Assocs., Inc., 22 F.3d 1198, 1203 (1st Cir. 1994). Under this method, the court may deny or defer consideration of the summary judgment motion "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition[.]" Fed. R. Civ. P. 56(d). "A basic tenet of [Rule 56(d)] practice is that the party seeking discovery must explain how the facts, if collected, will 'suffice to defeat the pending summary judgment motion.'" Asociacion de Periodistas de P.R. v. Mueller, 680 F.3d 70, 77 (1st Cir. 2012) (citation omitted). The filing party must supply the court with a statement (1) explaining her inability to adduce facts essential to filing an opposition to the summary judgment motion; (2) providing a plausible basis for believing that the sought-after facts can be assembled with a reasonable time; and (3) indicating how these facts would influence the outcome of the

pending summary judgment motions. <u>Velez v. Awning Windows, Inc.</u>, 375 F.3d 35, 40 (1st Cir. 2004). The court may refuse such a request if it concludes that the party opposing summary judgment is unlikely to garner useful evidence from the discovery sought. <u>Hicks v. Johnson</u>, 755 F.3d 738, 743 (1st Cir. 2014).

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. <u>Griggs-Ryan v. Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment[.]" <u>Anderson</u>, 477 U.S. at 255.

## IV. Discussion

### A. *Waiver of Claims Under the July 24, 2024 Agreement*

Defendants first contend that, based on undisputed material facts, Plaintiffs waived any claims against the Town associated with the Town's exercise of its Chapter 61B statutory right of first refusal to purchase the Property. In doing so, they direct the court to the Chapter 61B Agreement.

"[W]hen the language of a contract is clear, it alone determines the contract's meaning[,]" and the contract's language is "construed according to its plain meaning." <u>Balles v. Babcock Power Inc.</u>, 476 Mass. 565, 571, 70 N.E.3d 905, 911 (2017). If the contract language is "ambiguous[,]" however, a court may "consider extrinsic evidence" to interpret the contract's meaning. <u>Id.</u> The Massachusetts Supreme Judicial Court finds ambiguity in contractual language when such language "can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken.'" <u>Bank v. Thermo Elemental Inc.</u>, 451 Mass. 638, 648, 888 N.E. 2d 897, 907 (2008). An ambiguity "is not created simply because a

controversy exists between the parties, each favoring an interpretation contrary to the other." Lumbermens Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466, 645 N.E.2d 1165, 1168 (1995) (citation omitted); see Tenants' Dev. Corp. v. AMTAX Holdings 227, LLC, 495 Mass. 207, 218–19, 248 N.E.3d 647, 659 (2025).

A party may contract to waive federal constitutional claims. See, e.g., D. H. Overmyer Co., Inc. of Ohio v. Frick Co., 405 U.S. 174, 185 (1972) [hereinafter Overmyer] (parties able to waive right to notice and hearing prior to civil judgment); Higgins v. Town of Concord, 322 F. Supp. 3d 218, 225 (D. Mass. 2018) (employee validly waived right to pursue constitutional claims so long as waiver was knowing and voluntary). A waiver of such rights, however, is not effective unless it is undertaken knowingly and voluntarily. See Am. Airlines, Inc. v. Cardoza-Rodriguez, 133 F.3d 111, 117 (1st Cir. 1998).

In assessing whether a party has agreed to a waiver knowingly and voluntarily, "no single factor or circumstance is entitled to talismanic significance[,]" and a court must evaluate "the totality of the circumstances[.]" Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 181 (1995). To aid in this determination, courts may look to six non-exhaustive factors:

> (1) the plaintiff's education, business experience, and sophistication; (2) the parties' respective roles in deciding the final terms of the arrangement; (3) the agreement's clarity; (4) the amount of time available to the plaintiff to study the agreement before acting on it; (5) whether the plaintiff had independent advice—such as the advice of counsel—when [the plaintiff] signed the agreement; and (6) the nature of consideration tendered in exchange for the waiver.

Id. at 181 & n.3 (first citing Finz v. Schlesinger, 957 F.2d 78, 82 (2d Cir. 1992); and then citing Lanioke v. Advisory Comm. of Brainerd Mfg. Co. Pension Plan, 935 F.2d 1360, 1368 (2d Cir. 1991)). It is "not necessary" that each of these factors be satisfied before the waiver may be enforced. Melanson v. Browning-Ferris Indus., Inc., 281 F.3d 272, 276 (1st Cir. 2002).

12

The court first finds that the language of the Chapter 61B Agreement is unambiguous as to the disputed waiver provisions. Plaintiffs contend that the Agreement is ambiguous as to waiver of constitutional claims where its "text it silent on constitutional claims, and its language is framed exclusively in terms of waiving objections to the mechanics of the Town's exercise of its purchase option under G.L. c. 61B, § 9." Opp'n 10 [Doc. No. 41]. Plaintiffs' reading, however, ignores the plain language of the waiver provision, which states that 320 Fall River "forever waives and relinquishes its objections to the Town's actions, as well as any and all claims that the Town has waived its right of first refusal/option to purchase the [Property]." Chapter 61B Agreement at ECF 14 ¶ 2(viii) [Doc. No. 36-1]. The contract thus contemplated two categories of waiver: (1) waiver of Plaintiffs' claims that the Town waived its option under Chapter 61B to purchase the Property, which Plaintiffs do not dispute; and (2) waiver of any other objections to the Town's actions regarding its Chapter 61B, without limitation as to the nature of such objections.

Accompanying language in the Chapter 61B Agreement lends further support to the unambiguous nature of Agreement's waiver provisions. The Agreement, for example, specifies that its existence was precipitated by the parties' interest in "avoid[ing] litigation and the attendant risks and costs related thereto[,]" such that the parties were "desirous of resolving any issues and disputes as to one another[.]" Chap. 61B Agreement at ECF 12 [Doc. No. 36-1]. Accordingly, the parties "determined to resolve the issues and this Dispute among them upon the terms, conditions and provisions of this Agreement[.]" Id. (emphasis added). "Dispute" here refers to the parties' differing views on the sufficiency of the Notice and whether the Chapter 61B option was waived. See id. ("[A]s a result of the foregoing, there exists a dispute between the Parties regarding the Town's option to purchase the [Property] under M.G.L. c. 61B

13

(hereinafter the 'Dispute')[.]"). The Agreement's reference to the parties' determination to resolve "the issues and this Dispute" therefore encapsulates more than the specific "Dispute" alone and speaks to the broader nature of Plaintiffs' waiver of claims. That the Agreement also sets forth a very detailed process through which the parties would engage with an appraiser for the Property and ultimately close on the sale of the Property to the Town further indicates that the parties, without reservation, intended to move forward with the transaction. See id. at ECF 13 ¶ 2(i)–(vi).

As to whether Plaintiffs' waiver was effective, Plaintiffs argue that (1) although "it has not been expressly held" to apply in civil cases, the "voluntary, knowing, and intelligent" standard for waiver in the criminal context "has been applied by the Supreme Court to the evaluation of a waiver of constitutional rights in civil cases" and appears to ask this court to do the same; and (2) although it "has not been settled in the First Circuit whether there is an additional consideration beyond the 'voluntary, knowing, and intelligent' standard[,]" "at least one circuit has held that even where this standard is satisfied, the waiver is 'unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement.'" Opp'n 7–8 [Doc. No. 41].

As to the latter, the court will not add the public policy requirement to the waiver analysis where Plaintiffs acknowledge that the First Circuit has not adopted it. See id. at 8. As to the former, Plaintiffs appear to rely on the following statement in Overmyer:

> Even if, for present purposes, we assume that the standard for waiver in a criminal proceeding, that is, that it be voluntary, knowing, and intelligently made, or an intentional relinquishment or abandonment of a known right or privilege, and even if, as the Court has said in the civil area, we do not presume acquiescence in the loss of fundamental rights, that standard was fully satisfied here.

14

405 U.S. at 185–86 (quotations and citations omitted) (emphasis added). In light of the text of the Supreme Court's opinion in Overmyer, the court finds no reason to apply the criminal standard here where Plaintiffs urge the court to do so based on an apparent overreading of the case.

Applying the standard for knowing and voluntary waiver in the civil context, see Am. Airlines, Inc., 133 F.3d at 117, the court finds that, based on the summary judgment record, there is no genuine issue as to whether Plaintiffs sufficiently waived any claims against the Town pursuant to the Chapter 61B Agreement. Critically, Plaintiffs averred in the Agreement that:

> Each Party has read this agreement, understands the effect and scope of this Agreement and has had the assistance of separate and independent legal counsel of its choice in carefully reviewing, discussing and considering all terms of this Agreement or has elected to enter into this Agreement without consulting legal counsel.

Chap. 61B Agreement at ECF 15 ¶ 11(i) [Doc. No. 36-1]. Plaintiff Tapalian, who signed the Agreement as the owner of 320 Fall River, now asserts that he did not agree to waive constitutional claims and did not believe he was doing so, but he does not offer any evidence as to what this belief was based on or how the Agreement would work if Plaintiffs were still retaining rights to dispute any real estate transaction. He also does not claim an inadequate opportunity to review the agreement, deny that he had an opportunity to consult legal counsel, or point to any untoward circumstances in the negotiation of the agreement. See Smart, 70 F.3d 181 & n.3 (listing factors helpful to the court in determining validity of waiver).

Accordingly, the court finds that there is no genuine issue of material fact as to whether Plaintiffs validly waived any claims regarding the Town's exercise of its Chapter 61B option. But, even if Plaintiffs had not effectively waived their claims via the Chapter 61B Agreement, Defendants are entitled to summary judgment on the merits, as described infra.

15

B.  *Unconstitutional Taking Claim*

In their Complaint [Doc. No. 1], Plaintiffs assert that the Property was unlawfully "taken" by the Town, in violation of the Fifth Amendment to the United States Constitution and Article X of the Massachusetts Constitution. Id. ¶¶ 43–49. In Plaintiffs' view, the Property was "taken" in "retaliation" for Plaintiffs' attempt to develop the Property into affordable housing units under Mass. Gen. Laws ch. 40B. Id. ¶¶ 46–47. In support of their Motion for Summary Judgment [Doc. No. 34], Defendants argue that the Town's exercise of its statutory right of first refusal to purchase the Property does not constitute a "taking." See Mem. ISO Mot. for Summ. J. 5 [Doc. No. 35].

Under the Fifth Amendment, as applied to the states through the Fourteenth Amendment, private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V; see also Mass. Const. Pt. 1, art. X ("[W]henever the public exigencies require that the property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor."). The Fifth Amendment does not prohibit the government from appropriating private property, so long as just compensation is paid. See U.S. ex rel. Tenn. Valley Auth. v. Welch, 327 U.S. 546, 554–55 (1946); Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 536–37 (2005).

The Supreme Court has articulated that a government "commits a physical taking when it uses its power of eminent domain to formally condemn property[,]" "physically takes possession of property without acquiring title to it[,]" or "when it occupies property—say, by recurring flooding as a result of building a dam." Cedar Point Nursery v. Hassid, 594 U.S. 139, 147–48 (2021). When a physical taking occurs, "the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation." Id. at 147.

16

The Takings Clause also does not permit "one person's property [to be] taken for the benefit of another private person without a justifying public purpose, even though compensation be paid." Fideicomiso De La Tierra Del Cano Martin Pena v. Fortuno, 604 F.3d 7, 17 (1st Cir. 2020) (quoting Thompson v. Consol. Gas Utils. Corp., 300 U.S. 55, 80 (1937)). But when property is taken for "public use," the court reviews such takings deferentially. See Haw. Housing Auth. v. Midkiff, 467 U.S. 229, 242–43 (1984) ("When the legislature's purpose is legitimate and its means are not irrational . . . empirical debates over the wisdom of takings—no less than debates over the wisdom of other kinds of socioeconomic legislation—are not to be carried out in the federal courts.").

In the first instance, Plaintiffs' position that the sale of the Property to the Town constituted a taking is contradicted by the summary judgment record. Plaintiffs long reaped the benefit of favorable tax treatment under Mass. Gen. Laws ch. 61B, a condition of which was acceptance of the Town's statutory right of first refusal to purchase the Property if Plaintiffs sought to convert it to non-recreational use. See Mass. Gen. Laws ch. 61B, § 9. Plaintiffs were clearly aware of this requirement, given that they adhered to the statute's requirement that they notify the Town of their intent to convert the property prior to doing so. See Notice at 1–2 [Doc. No. 43-1] ("In accordance with M.G.L. c. 61B, § 9, please accept this correspondence as [o]ur [c]lients' Notice of Intent to Convert the Property from recreational to residential use."). It was when Plaintiffs gave this required notice that the Town sought to pursue its statutory right to purchase the Property—and the exercise of such a statutory right is not a "taking" in the constitutional sense. See Cedar Point Nursery, 594 U.S. at 147–48 (listing several ways in which a physical taking may be effected, none of which involve the government's exercise of a statutory right of first refusal); accord Greenfield Country Ests. Tenants Ass'n., Inc. v. Deep, 423

17

Mass. 81, 87, 666 N.E.2d 988, 992 (1996) (stating that "mere conditioning [of] the sale of the property to a right of first refusal does not amount to a taking" in a case concerning a Massachusetts statute granting a right of first refusal to resident associations when the owner of a manufactured housing community seeks to sell the community).

Even assuming, arguendo, that the Town's actions regarding the Property could be considered a taking, the summary judgment record would not permit a reasonable jury to find that the Town violated either the public purpose or the just compensation requirements of the Takings Clause. As to the just compensation requirement, the record is clear that the Town paid Plaintiffs the dollar amount value of the Property at which the third-party assessor arrived. There is nothing in the record to suggest that the $6,970,000 purchase price was somehow deficient or unjust relative to the Property's actual value, particularly where the assessor was jointly assented to and retained by the Town and Plaintiffs.

As to the public purpose requirement, Plaintiffs assert that Defendants engaged in a "purely obstructive taking, bereft of any contemporaneous public purpose" when the Town exercised its Chapter 61B right to purchase the property. This position reflects neither the law nor the facts before the court. Although it is true that the Town would not be permitted to take one person's private property "for the benefit of another private person without a justifying public purpose," see Fideicomiso, 604 F.3d at 17, the Town took no such action with respect to the Property. Plaintiffs have not pointed to any specific evidence suggesting that the Property was purchased with the intention of transferring it to a private party—and even if the Town did so, Chapter 61B permits a municipality to transfer its right of first refusal option to private actors in limited circumstances. See Certified Town Meeting Vote at ECF 3 [Doc. No. 36-4] (motion passed concerning the property would permit the Town to appropriate funds to "acquire,

pursuant to G.L. c. 61B, § 9 . . . the Property . . . <u>for general municipal purposes</u>" (emphasis added)); Mass. Gen. Laws ch. 61B, § 9 (subject to a public hearing, "the city or town <u>may assign its option to a nonprofit conservation organization</u> . . . or any of [the commonwealth's] political subdivisions" (emphasis added)).

Accordingly, Defendants' motion for summary judgment is GRANTED as to Count I.

C. *Selective Enforcement and First Amendment Retaliation Claims*

In Count II of their Complaint [Doc. No. 1], Plaintiffs contend that, "[b]y undertaking a retaliatory scheme against Plaintiffs, Defendants have unlawfully and substantially deprived Plaintiffs of rights secured by the First and Fourteenth Amendments to the United States Constitution[.]" <u>Id.</u> ¶ 51. Similarly, in Count III, Plaintiffs assert that Defendants "retaliat[ed]" against Plaintiffs for "filing applications with MassHousing and the Town to develop the Property under G. L. c. 40B, [which are] activities consistent with and protected by their right secured by the First Amendment" under the federal and state constitutions. <u>Id.</u> ¶¶ 56–58. As to this count, Plaintiffs further assert that "Defendants . . . in making various public accusations of Plaintiffs' project and in taking other calculated actions designed to interfere with Mr. Tapalian's other developments, together with the Property, acted under color of state law." <u>Id.</u> ¶ 57.

In the First Circuit, a First Amendment retaliation claim requires that a party "(1) engaged in constitutionally protected conduct, (2) was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action." <u>Gattineri v. Town of Lynnfield, Mass.</u>, 58 F.4th 512, 514 (1st Cir. 2023) (quotation omitted) (cleaned up). An adverse action "is an action that would deter a reasonably hardy person from exercising his or her constitutional rights." <u>D. B. ex rel. Elizabeth B. v. Esposito</u>, 675 F.3d 26, 43 n.11 (1st Cir. 2012) (citing <u>Barton v. Clancy</u>, 632 F.3d 9, 29 (1st Cir. 2011)).

19

Setting aside whether the submission of an application for a real estate development constitutes protected conduct under the First Amendment, Plaintiffs have not offered sufficient evidence to demonstrate that they were subjected to an "adverse action."

As to adverse action, Plaintiffs center their argument on the Chapter 61B sale of the Property itself, alleging, inter alia, that "Defendants—particularly Andrade and Hines— leveraged the statutory mechanism of G.L. c. 61B, § 9 not for any legitimate municipal purpose, but as a punitive and selective measure to obstruct a lawfully approved affordable housing project and retaliate against Plaintiffs for protected petitioning and political speech"; Andrade "publicly advocated for the acquisition of Plaintiffs' property over their objections[,]" at least partially in response to Plaintiffs refusal to engage in a $365,000 private contract with Andrade in an unrelated project; and Hines "used her public platform to disparage Plaintiffs' developments, sow unfounded fears about fiscal impacts, and press for acquisition of the property without any articulated public-use plan." Opp'n 17–18 [Doc. No. 41].

Far from suggesting a conspiracy of sorts, however, the summary judgment record demonstrates that (1) the purchase of the property was undertaken pursuant to the Town's statutory right of first refusal under Chapter 61B, of which Plaintiffs were aware; and (2) the appropriation of funds necessary to complete the purchase was approved by the Town's residents in an open meeting, with 271 votes in favor of the appropriation, eighteen votes against it, and zero votes abstaining. That Plaintiffs applied for, and received, approval from MassHousing for their desired real estate development in no way vitiated the Town's right to pursue its Chapter 61B right of first refusal, regardless of what Plaintiffs viewed as the better path forward for the Property.

Defendants' motion for summary judgment as to Counts II and III is GRANTED.

20

D. *Statutory Rescission*

As to Plaintiffs' claim that they are entitled to "statutory rescission" of the Purchase and Sale Agreement of the Property, see Compl. ¶¶ 67–71 [Doc. No. 1], Defendants argue that Plaintiffs rely on an inapplicable statute.

Plaintiffs assert that Defendants "acted in bad faith and infringed upon Plaintiffs' property rights, particularly regarding the development of G. L. c. 40B housing[,]" id. ¶ 69, and that, "[t]hrough their retaliatory actions, Defendants conspired to induce Plaintiffs into entering the [Purchase and Sale Agreement] with the sole intent of obstructing Plaintiffs' project on the Property, despite having no immediate plan to develop the land[,]" id. ¶ 68. Based on these allegations, Plaintiffs allege that they are entitled to rescission pursuant to a provision of the Commonwealth's Uniform Procurement Act ("UPA"), Mass. Gen. Laws ch. 30B, § 17. Id. ¶ 71. Section 17 of the UPA provides:

> (a) All contracts in the amount of $10,000 or more shall be in writing, and the governmental body shall make no payment for a supply or service rendered prior to the execution of such contract.
>
> (b) Subject to the provisions of section three A of chapter forty, a contract made in violation of this chapter shall not be valid, and the governmental body shall make no payment under such contract. Minor informalities shall not require invalidation of a contract.
>
> (c) A person who causes or conspires with another to cause a contract to be solicited or awarded in violation of a provision of this chapter shall forfeit and pay to the appropriate governmental body a sum of not more than two thousand dollars for each violation. In addition, the person shall pay double the amount of damages sustained by the governmental body by reason of the violation, together with the costs of any action. If more than one person participates in the violation, the damages and costs may be apportioned among them.
>
> (d) The inspector general shall have authority to institute a civil action to enforce paragraph (c) if authorized by the attorney general.

Mass. Gen. Laws ch. 30B, § 17.

Accepting, <u>arguendo</u>, Plaintiffs' assertion that municipalities acting pursuant to Mass. Gen. Laws ch. 61B are "not exempt . . . from compliance with the [UPA] when entering into contracts involving the expenditure of public funds[,]" Opp'n 26 [Doc. No. 41], the court finds no connection between the purported wrongful action and the statutory provision.

In any event, even if Defendants' actions somehow violated this statute, Mass. Gen. Laws ch. 30B, § 17, provides Plaintiffs no avenue for relief. First, Plaintiffs' position relies on a fundamental misunderstanding of the remedy available under § 17. Pursuant to § 17(c), a party in violation of the UPA must "forfeit and pay" up to $2,000 for each violation, plus damages and any costs of the associated legal action. Mass. Gen. Laws ch. 30B, § 17(c). The statute therefore provides no authority under which the court may "rescind" the Purchase and Sale Agreement for the Property. Second, § 17(d) provides for a statutory right of action for the "inspector general" to seek damages sustained by a governmental body but no such right for a private actor. <u>See</u> Mass. Gen. Laws ch. 30B, § 17(d) ("The inspector general shall have authority to institute a civil action to enforce paragraph (c) if authorized by the attorney general.").

Thus, where Mass. Gen. Laws ch. 30B, § 17 provides neither the remedy Plaintiffs seek nor a private right of action through which they could pursue it, Defendants' motion for summary judgment as to Count V is GRANTED.

E.  *Declaratory or Injunctive Relief*

Insofar as Plaintiffs seek declaratory or injunctive relief (Count IV), where Defendants are entitled to summary judgment on Plaintiffs' claims for the reasons described <u>supra</u>, Plaintiffs are not entitled to such relief.

## V.      Conclusion

For the foregoing reasons, Defendant's <u>Motion for Summary Judgment</u> [Doc. No. 34] is

GRANTED.

IT IS SO ORDERED.

April 7, 2026, corrected April 9, 2026        /s/ Indira Talwani
                                              United States District Judge